IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| DAVID S. JARJISIAN, | : |
| DEBTOR(S) | : BANKRUPTCY NO. 02-15711 SR |
| COMMUNITY BANKS, SUCCESSOR BY MERGER TO COMMUNITY BANKS, N.A., | : |
| PLAINTIFF | : ADVERSARY NO. 04-0659 SR |
| V. | : |
| START PROPERTIES, II, LLC, START PROPERTIES, LLC, DAVID S. JARJISIAN AND VICTORIA A. JARJISIAN, | : |
| DEFENDANT(S) | : |

# OPINION

By: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

## I. Introduction

Before the Court is Plaintiff Community Bank's ("Bank") Motion to Fix the Fair Market Value of a property known as the Spring Lake Village Mobile Home Park ("Property") located in Delaware Township, Northumberland County, Pennsylvania. The Court held a hearing on this matter on August 17-18, 2005. For the reasons stated below, the Court finds the fair market value of the Property as of December 2, 2003 to be $1,750,000.

## II. Background

This case arises from a loan made by the Bank to Debtor's corporation. Debtor's corporation secured the loan by taking out a mortgage on the mobile home park it owned, i.e., the Property. As additional collateral, the Debtor guaranteed the loan and gave the

Bank a second mortgage on his home. After Debtor defaulted, the Bank foreclosed on the Property and successfully bid on the Property at a November 12, 2003 sheriff's sale. The deed to the Property was dated December 2, 2003 and recorded in Northumberland County's Recorder of Deeds' Office on January 6, 2004.

On May 28, 2004, in accordance with the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S. § 8103,[1] the Bank filed a Petition to Fix Fair Market Value in the Court of Common Pleas of Northumberland County. On June 22, 2004, the parties agreed to remove the Petition to this Court. This Court held a hearing on August 17-18, 2005 (hereinafter cited as "8/_/05 Tr. at _") to retrospectively determine the fair market value of the Property on the sale date, a determination that will ultimately affect any deficiency claim the Bank may have under the Deficiency Judgment Act.

The Property is a 124-pad[2] mobile home park situated on 48 acres of gently rolling topography. The Property also encompasses approximately 13 acres of additional land that has been approved for development of another 50 pads. In addition, the Property maintains its own on-site water and sewer treatment plant, which serves not only the

---

[1] Section 8103 defines what a lender must do to preserve any deficiency claim following the purchase of a property at a sheriff's sale:
> (a) General rule.– Whenever any real property is sold, directly or indirectly, to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due on said judgment, interest and costs, the judgment creditor shall petition the court to fix the fair market value of the real property sold. . . .

42 Pa.C.S. § 8103(a).

[2] A discrepancy exists over the exact number of pads that the site hosts– the Bank's appraiser identifies 124 pads in one appraisal but 132 in his other.

2

tenants of the park but also a neighboring 36-home subdivision. The neighboring residents pay a monthly fee of $25 per dwelling for water service.

## III. Discussion

To determine the Property's fair market value[3] on December 2, 2003,[4] the Court first examines both parties' appraisals, which notably use the same (accepted) methodology. The Bank submitted two appraisal reports dated nearly one year apart, both of which were

---

[3] "Market value" is defined as:
> . . . the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby:
> (1) buyer and seller are typically motivated;
> (2) both parties are well informed or well advised, acting in what they consider their own best interest;
> (3) a reasonable time is allowed for exposure in the open market;
> (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> (5) the price represents the normal consideration for the property, sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

See Rules and Regulations, *Federal Register*, Volume 55, Number 165, at 34969.

[4] The sheriff's sale was held on November 12, 2003. The Bank, however, submitted appraisals valuing the Property as of February 21, 2003 and February 2, 2004. Defendants submitted an appraisal valuing the Property as of the deed date–December 2, 2003–a date within three weeks of the sale date. To the extent that the appraisals offered provide evidence of the Property's fair market value on the sheriff's sale date, the Court will rely on them because the parties have provided nothing more precise. Furthermore, the Court will adopt December 2, 2003–the date used by Defendants' appraiser–as the valuation date because it is a date not unreasonably delayed from the sale date, and therefore serves the intent of the statute. Moreover, the parties during the hearing agreed that December 2, 2003 should be used as the valuation date.

prepared by Jeffrey L. Walters of Walters Appraisal Service, Inc. The first appraisal, dated February 24, 2003, appraised the Property as of February 21, 2003 at $1,850,000. The second appraisal, dated February 9, 2004, appraised the Property as of February 2, 2004 at approximately $1,300,000,[5] a nearly 29-percent reduction in value from the 2003 appraisal.

In response, Defendants submitted two reports prepared by Reaves C. Lukens of the Reaves C. Lukens Company. Mr. Lukens prepared a review of the Bank's appraisal and provided his own valuation of the Property as of December 2, 2003. Mr. Lukens estimated the fair market value of the Property on December 2, 2003 to be $1,800,000.

At the August hearing, the parties also presented additional, extrinsic evidence, the sum of which illustrates the common observation that real estate appraisal is an inexact science. There are three widely acknowledged methodologies to the valuation of real estate: the income approach, the replacement cost approach, and the sales comparison approach. Both appraisers agree that the most accepted methodology for present purposes is the income approach.[6] Each noted, but failed to develop, the replacement cost approach. Finally, both used the third method, the sales comparison approach,[7] to test the

---

[5] *See* Walters' February 9, 2004 Appraisal, at 42, 51.

[6] Under the income approach, an appraiser derives a value indication for income-producing property by converting anticipated benefits, i.e., cash flows and reversions, into property value. *See* Walters' February 24, 2003 Appraisal, at 30 (citing American Institute of Real Estate Appraisers, *The Dictionary of Real Estate Appraisal*, 2nd ed., American Institute of Real Estate Appraisers: Chicago, at 156 (1989)).

[7] Under the sales comparison approach, an appraiser "derives a value indication by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison and making adjustments, based on the elements
(continued...)

4

validity of their respective opinions using the income approach.

Turning to the appraisals, the Court first notes that the Bank's appraisals fail to determine the Property's value on the relevant date, December 2, 2003. Rather, the Bank's appraiser valued the Property on dates–February 21, 2003 and February 2, 2004–several months removed from the sale date. By contrast, Defendants' appraiser valued the Property on December 2, 2003. Because the Defendants' appraisal provides valuation on the relevant date, the Court finds it more probative of the inquiry at hand.

Next, the Court turns to the appraisers' analyses of occupancy rates. In the Bank's first appraisal, Mr. Walters forecasted that an 87.5% occupancy rate would be reached in year four following stabilization and improvements in the projected period. (8/17/05 Tr. at 101-102). One year later, Mr. Walters forecasted a fixed 64.5% occupancy rate with no expected future change. (8/17/05 Tr. at 78, 102). Mr. Walters prepared the second appraisal after the Bank asked him to supplement his earlier appraisal with a liquidation value[8] based upon the current occupancy and continuing water problems at the park. *See*

---

[7](...continued)
of comparison, to the sales price of the comparable." *See* Walters' February 24, 2003 appraisal (citing American Institute of Real Estate Appraisers, *The Dictionary of Real Estate Appraisal*, 2nd ed., American Institute of Real Estate Appraisers: Chicago, at 265 (1989)).

[8] In contrast to fair market value, liquidation value contemplates a seller under extreme compulsion to sell and a severely limited future marketing period. *See* Lukens' Appraisal, at 3. Defendants filed a motion in limine seeking to exclude Mr. Walters' second appraisal, alleging (1) it uses the term "liquidation market value" which is a term not recognized in the lexicon of real estate appraising and moreover is contradictory, and (2) it purports to offer an opinion on liquidation value, a value that has no relevance to the inquiry at hand. Mr. Walters conceded that the term "liquidation market value" was a typographical error and that he intended to use the term "liquidation value" throughout his report. (8/17/05 Tr. at 81). But he argued that he opined on fair market value in his second appraisal because his method of determining liquidation value involved first calculating the
(continued...)

5

January 21, 2004 letter from R. Granger to J. Walters. By using the then-current 64.5% occupancy rate, Mr. Walters dropped the estimated net operating income from $224,000 in the first appraisal to $136,453 in the second, representing a decline of $90,000 or nearly 40%.

The Court finds Mr. Walters' analysis flawed in several respects. First, it is evident that the strict parameters placed on Mr. Walters with regard to using the current occupancy rate constrained him from his ability to offer an independent valuation of the Property.[9] Mr. Walters' use of a fixed occupancy rate represents an unreasonable assumption and departure from accepted methodologies. Indeed, using such a static rate is at odds with the purpose and meaning of determining fair market value. Assuming a never-improving 64.5% occupancy rate, it is hard to imagine the Property ever being salable under the Bank's appraisal. Second, the Court finds Mr. Walters' attempts to distance himself from his earlier report undermine his credibility as an expert. Mr. Walters testified that because vacancies rose by the end of 2003, his earlier predictions of stabilization were inaccurate. (8/17/05 Tr. at 103, 112). In adopting this strategy of impugning his earlier estimate of value, Mr. Walters undermines his own credibility. The Court questions why it should give any weight to Mr. Walters' second appraisal after he has admitted he erred so gravely with

---

[8](...continued)
fair market value of the Property and then discounting that number by 10%. (8/17/05 Tr. at 108). Although this method strikes the Court as rudimentary, the Court did deny Defendants' motion, allowing admission of the second appraisal and testimony but only to the extent they opine on fair market value.

[9] Interestingly, Mr. Walters admits that the second appraisal was never prepared for the purpose of, nor intended to be used as evidence of, fair market valuation as of the sale date. (8/17/05 Tr. at 68).

the first. In any event, the Court places little probative weight on the Bank's appraisals.

By contrast, Defendants' appraiser forecasted a stabilized occupancy rate of 85%. (8/18/05 Tr. at 29-30). Although Mr. Lukens acknowledged that the occupancy rate had decreased slightly by the end of 2003, he testified that nothing precluded the Property's remediation, which would likely result in higher occupancy rates. (8/18/05 Tr. at 29-30). Mr. Lukens' estimate of stabilization is in fact more conservative than the one Mr. Walters provided in his initial appraisal. The Court finds Mr. Lukens analysis of occupancy rates to be the more credible of the estimates before it.

The Court next considers the appraisers' differing views on improvements necessary to repair the Property, including most significantly the water and sewer treatment facility. In his first appraisal, Mr. Walters projected an expense ratio of 35%. In his second appraisal, he increased that ratio to 39% based in part on what he determined to be ongoing, severe problems with the water and sewer system. (8/18/05 Tr. at 109). Defendants' appraiser, on the other hand, forecasted an expense ratio of 37%. (8/18/05 Tr. at 31). Specifically, Mr. Lukens budgeted a flat amount of $75,000 to improve the water and sewer system and cover costs relating to re-leasing vacant pads and promotional expenses necessary to recruit new tenants. (8/18/05 Tr. at 34).

The evidence suggests that the industry norm for this type of property is an expense ratio of 30-40% (8/18/05 Tr. at 32). The Property's historic operating expenses have ranged above the norm due to one-time repair expenses in 2002 and higher than normal professional fees in 2003. (8/17/05 Tr. at 74-75). With a greater expense ratio depressing net income, this estimation clearly impacts the ultimate value of the Property. Although the Court generally finds the Defendants' appraisal is entitled to greater probative weight than

7

the Bank's, the Court finds that Mr. Lukens' estimate in this instance appears somewhat deflated. The Bank's officer, Raymond Granger, testified to problems with surface water infiltration that, by all accounts, will require significant costs to remediate.[10] (8/17/05 Tr. at 32-35). Recognizing the magnitude of ongoing problems with the water and sewer facility, the Court will adjust Defendants' appraisal downward by $50,000 to better reflect the costs of necessary improvements.[11]

Next, the Court weighs the appraisers' conflicting valuations of the 13 surplus acres. Mr. Walters valued the extra acreage at $3,000 per acre based on comparable land sales of undeveloped land. (8/18/05 Tr. at 63-64). By contrast, Mr. Lukens valued the surplus acreage based on the potential development of additional income-producing pads. Specifically, Mr. Lukens estimated the 50 additional pads to be worth $2,000 each, for a total of $100,000 in additional value to the Property. (8/18/05 Tr. at 33). In Mr. Walters' view, because the vacancy rate is so high and likely to continue as such, no foreseeable reason exists to develop the additional pads. Accordingly, Mr. Walters believes that the land should be valued in its undeveloped state. Although Mr. Lukens agrees that the

---

[10] The Court has attached virtually no weight to the remaining testimony of Mr. Granger, which was replete with hearsay, speculation, legal conclusions and was almost wholly lacking in foundation.

[11] The parties also disagree on the efforts necessary to obtain rate relief from the $25 per dwelling flat rate currently being charged to the neighboring 36 homes for water. The evidence failed to clarify how long the $25 rate will remain in effect or how the Property's owner can obtain a rate adjustment. The parties do agree that the $25 fee is well below market. (8/17/05 Tr. at 85-86). Predictably, Mr. Lukens downplayed the efforts he thinks would be necessary to obtain rate relief, while Mr. Walters predicted a lengthy bureaucratic process. Without a more complete record, the Court cannot determine the ease with which rate relief may be obtained. Suffice it to say, however, that the Court finds it a reasonable assumption that competent management could avail itself of some procedure to obtain a market rate adjustment to its current fee.

additional pads should not be developed until rentals increase and the occupancy rate stabilizes, he believes nonetheless that the value of the overall property should include the prospect of development and the potential revenue-producing income from the additional acreage. The Court here agrees with Defendants that the valuation of the 13 acres should include some enhancement based on the potential to develop additional income-producing pads. Accordingly, the Court finds Defendants' valuation of the surplus land to be the more sound of the estimates before it.

Finally, the Court considers the appraisers' respective comparative sales analyses. Defendants' appraiser disputes that Mr. Walters performed a true "comparative" sales analysis. Mr. Walters claims to have looked at five comparable sales in his first appraisal, ranging in size from 37 to 92 pads and in per pad rate from $11,689 to $13,980. Mr. Walters valued the Property under this approach at $12,500 per pad. In his second appraisal, Mr. Walters looked at six properties, ranging in size from 29 to 92 pads and in per pad rate from $6,552 to $13,980, and valued the Property at just $10,500 per pad. However, when pressed on the qualitative comparability of the parks– i.e., geographic location, number of pads, etc.–Mr. Walters conceded that he based his comparison solely on income. (8/17/05 Tr. at 60-61, 88-89, 95-96). In fact, the only comparable site that had close to 100 pads (comp #4) was disregarded entirely because Mr. Walters did not have income data for that site. (8/17/05 Tr. at 93). Mr. Walters also failed to compare the data on the sale of Pine Valley, a mobile home park in the same geographical area that accommodates roughly the same number of pads. (8/17/05 Tr. at 61). Based on these shortcomings, the Court finds that Mr. Walters' comparative sales analysis was neither complete nor truly comparative. Conversely, Mr. Lukens performed a true comparative

9

sales analysis, resulting in an estimate of sales per pad of $14,516 (8/18/05 Tr. at 28). Again, the Court finds Mr. Lukens' approach the more reliable of the two before it.

### IV. **Conclusion**

Reiterating the maxim that the appraisal of realty is an inexact science, the Court concludes that the value of the Property lies well toward the higher end of the estimates before it. The Court recognizes attractive features in the Property including the renter-friendly location, the ability to expand, mobile homes that are owner-occupied and maintained, and the limited number of on-site, depreciating assets. On the other hand, the Property clearly has shortcomings, the most significant of which are the water and sewer treatment facility and low occupancy rates. The Court believes, however, that these problems can be overcome with improvements.

As discussed above, the Court finds the Bank's appraisals deficient in numerous regards. First, the appraisals fail to value the Property at or about the sale date. Second, the Bank's second appraisal reflects an unrealistic assumption that the occupancy rate shall remain at 64.5% in perpetuity. Third, the Bank's appraiser undermines his own credibility by trying to distance himself from his earlier forecasts. Fourth, the Bank failed to recognize that the Property is entitled to some enhanced value because it has been approved for additional 50 pads and has the ability to generate an operating income much greater than it is currently producing.

Conversely, Defendants have offered their own credible valuation prepared at or about the sale date that allows for a realistic stabilization of the occupancy rate, and takes into account the Property's enhanced worth from the potential to develop the surplus land. The only area of concern that the Court has is Defendants' appraiser's estimation of costs

needed to improve the water problems that continue to plague the park. By all reasonable accounts, a significant amount of work is needed to rectify problems with the water and sewer treatment facility. For that reason, the Court will adjust Defendants' appraisal downward by $50,000 in an attempt to better estimate expenditures needed to adequately improve the Property.

Accordingly, the Court determines the value of the Spring Village Mobile Home Park as of December 2, 2003 to be $1,750,000.

An appropriate Order follows.

BY THE COURT:


STEPHEN RASLAVICH
DATED: October 26, 2005            UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 11 |
| DAVID S. JARJISIAN, | : |
| DEBTOR(S) | : BANKRUPTCY NO. 02-15711 SR |
| COMMUNITY BANKS, SUCCESSOR BY MERGER TO COMMUNITY BANKS, N.A., | : |
| PLAINTIFF | : ADVERSARY NO. 04-0659 SR |
| V. | : |
| START PROPERTIES, II, LLC, START PROPERTIES, LLC, DAVID S. JARJISIAN AND VICTORIA A. JARJISIAN, | : |
| DEFENDANT(S) | : |

# ORDER

**AND NOW**, upon consideration of Plaintiff's Motion to Fix the Fair Market Value of the Spring Lake Village Mobile Home Park, and any opposition thereto, and after a hearing held thereon on August 17-18, 2005, it is hereby:

**ORDERED**, that, for the reasons stated in the accompanying Opinion, the fair market value of the Spring Lake Village Mobile Home Park as of December 2, 2003, is fixed at $1,750,000.

BY THE COURT:

DATED: October 26, 2005

STEPHEN RASLAVICH
UNITED STATES BANKRUPTCY JUDGE

**MAILING LIST:**

Dexter K. Case, Esquire
Case DiGiamberardino & Lutz, P.C.
845 North Park Road, Suite 101
Wyomissing, PA 19610

Elliot H. Berton, Esquire
Steven L. Sugarman and Associates
1273 Lancaster Avenue
Berwyn, PA 19312

Eugene J. Malady, Esquire
200 E. State Street, Suite 309
Media, PA 19063

George Conway, Esquire
Office Of The U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia PA  19106